1 **JOHN C. ELLIS, JR.**
California State Bar No. 228083
2 **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 E-Mail: john_ellis@fd.org

5 Attorneys for Cesar Ponce-Salazar

6

7
UNITED STATES DISTRICT COURT
8
SOUTHERN DISTRICT OF CALIFORNIA
9
**(HONORABLE M. BERRY T. MOSKOWITZ)**
10

11 UNITED STATES OF AMERICA,  )  Case No. 08CR1019-BTM
                              )
12         Plaintiff,         )  DATE:      May 9, 2008
                              )  TIME:      1:30 p.m.
13 v.                         )
                              )  STATEMENT OF FACTS AND
14 **CESAR PONCE-SALAZAR**,       )  MEMORANDUM OF POINTS AND
                              )  AUTHORITIES IN SUPPORT OF
15         Defendant.         )  DEFENDANT'S MOTIONS
                              )
16 _____  )

17                              **I.**

18                    **STATEMENT OF FACTS**

19         The following statement of facts is based, in part, on materials received from the government.

20 Mr. Ponce-Salazar does not accept this statement of facts as his own, and reserves the right to take a contrary

21 position at motion hearings and trial.  The facts alleged in these motions are subject to amplification and/or

22 modification at the time these motions are heard.

23         On February 22, 2008, members of the North County Smuggling Interdiction Group ("SIG") were

24 assigned to work in the "Interstate 15 corridor."[1]  At approximately 10:10 a.m., Agent Mondragon was

25 observing northbound traffic on Interstate 15 ("I-15"), near the Old Highway 395 exit.  Agent Mondragon

26 saw a maroon Dodge Stratus traveling Northbound with what he believed were tinted windows.  The car was

27

28
─────────────────────
        [1]      Unless otherwise noted, all of this information is contained in Agent Noe
Mondragon's February 22, 2008 Report of Investigation.

1 | being driven at "a high rate of speed" and it appeared to be "very heavily loaded."  Agent Mondragon was
2 | unable to follow the vehicle.

3 |     Agent Hermenegildo Martinez, who was stationed near the Temecula Parkway exit on I-15, saw a
4 | car matching this description.  Agent Martinez observed that the "driver was heavy set, with notable acne
5 | scars on his face, and that the vehicles [sic] other windows were fogged up indicating the presence of several
6 | passengers."

7 |     After catching up with the car, Agent Mondragon ran a records check on the vehicle.  "The vehicle
8 | came back registered to an address in Logan Avenue in the city of San Diego, California.  This area is
9 | commonly known for harboring and housing undocumented aliens until alien smugglers can transport these
10 | individuals to their final destinations."  Agent Mondragon only observed two passengers, but noticed that the
11 | car looked heavily loaded because the rear cargo area was riding low and bouncing as it raveled.  "Noticing
12 | only two occupants, Agent Mondragon also found it suspicious that the windows in the vehicle were severely
13 | fogged, a common site on vehicles transporting several occupants with damp clothing.  This is consistent with
14 | aliens that have recently crossed into the United States though rough terrain and in the current rainy weather
15 | along the border area."  Moreover, Agent Mondragon believed that the car was avoiding the marked vehicle.
16 | Based on this, Agent Mondragon attempted to stop car.  According to Agent Mondragon, initially, the car
17 | failed to yield.

18 |     On April 2, 2008, the Government filed a six-count indictment against Mr. Ponce-Salazar, charging,
19 | in counts one, three and five, a violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2, and in counts two,
20 | four, and six, a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v) (II).

21 |     These motions follow.

22 | **II.**

23 | **MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

24 |     At this time, Mr. Ponce-Salazar has received limited discovery.  Mr. Salazar-Ponce moves for the
25 | production of the following discovery.  This request is not limited to those items that the prosecutor knows
26 | of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any
27 | "closely related investigative [or other] agencies."  See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

28 |

1        (1)   <u>The Defendant's Statements</u>.  The government must disclose to the defendant <u>all</u> copies of

2 any written or recorded statements made by the defendant; the substance of any statements made by the

3 defendant, which the government intends to offer in evidence at trial -- either in its case-in-chief or in rebuttal;

4 <u>see</u> <u>id.</u>, any response by the defendant to interrogation; the substance of any oral statements, which the

5 government intends to introduce at trial, and any written summaries of the defendant's oral statements

6 contained in the handwritten notes of the government agent; any response to any <u>Miranda</u> warnings, which

7 may have been given to the defendant; as well as any other statements by the defendant.  Fed. R. Crim.

8 P. 16(a)(1)(A)[2].  The Advisory Committee Notes and the 1991 Amendments to Rule 16 make clear that the

9 Government must reveal <u>all</u> the defendant's statements, whether oral or written, regardless of whether the

10 government intends to make any use of those statements.  Federal Rule of Criminal Procedure 16 is designed

11 "to protect the defendant's rights to a fair trial."  <u>United States v. Rodriguez</u>, 799 F.2d 649 (11th Cir. 1986);

12 <u>see also</u> <u>United States v. Noe</u>, 821 F.2d 604, 607 (11th Cir. 1987) (reversing conviction for failure to provide

13 statements offered in rebuttal -- government's failure to disclose statements made by the defendant is a serious

14 detriment to preparing trial and defending against criminal charges).  **This request includes, but is not**

15 **limited to, all dispatch tapes.**

16        (2)   <u>Arrest Reports and Notes</u>.  The defendant also specifically requests that the government turn

17 over all arrest reports, notes, TECS records, dispatch tapes, audio tapes, and video tapes not already produced

18 that relate to the circumstances surrounding his arrest or any questioning.  This request includes, but is not

19 limited to, any rough notes, records, reports, transcripts, referral slips, or other documents in which statements

20 of the defendant or any other discoverable material is contained.  Such material is discoverable under Fed.

21 R. Crim. P. 16(a)(1)(A) and <u>Brady v. Maryland</u>.  The government must produce arrest reports, investigators'

22 notes, memos from arresting officers, sworn statements, and prosecution reports pertaining to the defendant.

23 *See* Fed. R. Crim. P. 16(a)(1)(B) and (C), 26.2 and 12(I); <u>United States v. Harris</u>, 543 F.2d 1247, 1253 (9th

24 Cir. 1976) (original notes with suspect or witness must be preserved); <u>see also</u> <u>United States v. Anderson</u>, 813

25 F.2d 1450, 1458 (9th Cir. 1987) (reaffirming <u>Harris</u>' holding).

26

27

28        [2]  Of course, any of Mr. Ponce-Salazar's statements, which are exculpatory, must be produced, as well.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

08CR1019-BTM

1    (3)    <u>Brady Material</u>.  The defendant requests all documents, statements, agents' reports, and

2    tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the

3    government's case.  <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).  Under <u>Brady</u>, <u>Kyles</u> and their progeny,

4    impeachment, as well as exculpatory evidence, falls within the definition of evidence favorable to the

5    accused.  <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

6    This includes information obtained from other investigations which exculpates Mr. Ponce-Salazar.  Moreover,

7    Mr. Ponce-Salazar request all information regarding the immigration status of the material witness; a

8    complete criminal history report of the material witness; and any reports of investigation, prior statements,

9    prior arrest, etc. of the material witness.  **This requests includes, but is not limited to, all reports and notes**

10    **regarding arrests/apprehensions from Logan Avenue and the I-15 corridor areas of San Diego County.**

11    (4)    <u>Any Information That May Result in a Lower Sentence Under The Guidelines</u>.  The

12    government must also produce this information under <u>Brady v. Maryland</u>.  This request includes any

13    cooperation, or attempted cooperation, by the defendant, as well as any information, including that obtained

14    from other investigations or debriefings, that could affect any base offense level or specific offense

15    characteristic under Chapter Two of the Guidelines.  The defendant also requests any information relevant

16    to a Chapter Three adjustment, a determination of the defendant's criminal history, and information relevant

17    to any other application of the Guidelines.

18    (5)    <u>The Defendant's Prior Record</u>.  The defendant requests disclosure of his prior record.

19    Fed. R. Crim. P. 16(a)(1)(B).

20    (6)    <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence of prior similar acts

21    under Fed. R. Crim. P. 16(a)(1)(C) and Fed. R. Evid. 404(b) and 609.  In addition, "upon request of the

22    accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of

23    any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial and the purpose for

24    which introduction is sought.  This applies not only to evidence which the government may seek to introduce

25    in its case-in-chief, but also to evidence which the government may use as rebuttal.  <u>See</u> <u>United States v.</u>

26    <u>Vega</u>, 188 F.3d 1150 (9th Cir. 1999).  The defendant is entitled to "reasonable notice" so as to "reduce

27    surprise," preclude "trial by ambush" and prevent the "possibility of prejudice."  <u>Id.</u>; <u>United States v. Perez-</u>

28

1    <u>Tosta</u>, 36 F.3d 1552, 1560-61 (11th Cir. 1994).  Mr. Ponce-Salazar requests such reasonable notice at least

2    two weeks before trial, so as to adequately investigate and prepare for trial.

3           (7)    <u>Evidence Seized</u>.  The defendant requests production of evidence seized as a result of any

4    search, either warrantless or with a warrant.  Fed. R. Crim. P. 16(a)(1)(C).

5           (8)    <u>Request for Preservation of Evidence</u>.  The defendant specifically requests the preservation

6    of any and all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody,

7    or care of the government, and which relates to the arrest, or the events leading to the arrest, in this case.  This

8    request includes, but is not limited to, the results of any fingerprint analysis, the vehicle which the defendant

9    drove, the defendant's personal effects, any effects found within the vehicle, any evidence seized from the

10   defendant, or any third party in relation to this case, and all audio or video recordings of Mr. Ponce-Salazar

11   or any third parties related, directly or indirectly, to this case.

12          (9)    <u>Henthorn Evidence</u>.  Mr. Ponce-Salazar requests that the Assistant United States Attorney

13   assigned to this case oversee a review of all personnel files of each agent involved in the present case for

14   impeachment material.  <u>Kyles</u>, 514 U.S. at 419; <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991);

15   <u>United States v. Lacy</u>, 896 F. Supp. 982 (N.D. Ca. 1995).  At a minimum, the prosecutor has the obligation

16   to inquire of his agents in order to ascertain whether or not evidence relevant to veracity or other

17   impeachment exists.

18          (10)    <u>Tangible Objects</u>.  The defendant requests the opportunity to weigh the narcotics, to inspect

19   and copy, as well as test, if necessary, all other documents and tangible objects, including photographs, books,

20   papers, documents, fingerprint analyses, vehicles, or copies of portions thereof, which are material to the

21   defense, or intended for use in the government's case-in-chief, or were obtained from or belong to the

22   defendant.  Fed. R. Crim. P. 16(a)(1)(C).  Specifically, to the extent they were not already produced, the

23   defendant requests copies of all photographs in the government's possession of the vehicle, the defendants,

24   and any other photos taken in connection with this case.  **Additionally, Mr. Ponce-Salazar moves this court**

25   **to order the government to allow defense counsel to view, inspect, and copy Mr. Ponce-Salazar' A-file**

26   **and the A-file of the material witnesses.**

27          (11)    <u>Expert Witnesses</u>.  The defendant requests the name, qualifications, and a written summary

28   of the testimony of any person that the government intends to call as an expert witness during its case-in-

1  chief. Fed. R. Crim. P. 16(a)(1)(E).  The defense requests that notice of expert testimony be provided at a

2  minimum of three weeks prior to trial, so that the defense can properly prepare to address and respond to this

3  testimony, including obtaining its own expert and/or investigating the opinions and credentials of the

4  government's expert.  The defense also requests a hearing in advance of trial to determine the admissibility

5  of qualifications of any expert.  See Kumho v. Carmichael Tire Co., 119 S. Ct. 1167, 1176 (1999) (trial judge

6  is "gatekeeper" and must determine reliability and relevancy of expert testimony and such determinations may

7  require "special briefing or other proceedings . . ..").

8      (12)  Reports of Scientific Tests or Examinations.  Pursuant to Fed. R. Crim. P. 16(a)(1)(F),

9  Mr. Ponce-Salazar requests disclosure and the opportunity to inspect, copy, and photograph the results and

10  reports of all tests, examinations, and experiments conducted upon the evidence in this case, including, but

11  not limited to, any fingerprint testing done upon any evidence seized in this case, that is within the possession,

12  custody, or control of the government, the existence of which is known, or by the exercise of due diligence

13  may become known, to the attorney for the government, and that are material to the preparation of the defense

14  or are intended for use by the government as evidence in chief at the trial.

15      (13)  Evidence of Bias or Motive to Lie.  The defendant requests any evidence that any prospective

16  government witness is biased or prejudiced against the defendant, or has a motive to falsify or distort his or

17  her testimony.

18      (14)  Impeachment Evidence.  The defendant requests any evidence that any prospective

19  government witness has engaged in any criminal act whether or not resulting in a conviction, and whether

20  any witness has made a statement favorable to the defendant.  See Fed. R. Evid. 608, 609 and 613; Brady v.

21  Maryland.

22      (15)  Evidence of Criminal Investigation of Any Government Witness.  The defendant requests

23  any evidence that any prospective witness is under investigation by federal, state or local authorities for any

24  criminal conduct.

25      (16)  Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.  The

26  defense requests any evidence, including any medical or psychiatric report or evaluation, that tends to show

27  that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and

28

1  any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an

2  alcoholic.

3          (17)    Jencks Act Material.  The defendant requests production in advance of trial of all material,

4  including any tapes, which the government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500;

5  Fed. R. Crim. P. 26.2.  Advance production will avoid the possibility of delay at the request of the defendant

6  to investigate the Jencks material.  A verbal acknowledgment that "rough" notes constitute an accurate

7  account of the witness' interview is sufficient for the report, or notes, to qualify as a statement under

8  section 3500(e)(1).  Campbell v. United States, 373 U.S. 487, 490-92 (1963); see also United States v.

9  Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that where an agent goes over interview notes with subject

10 interview notes are subject to Jencks Act).

11         (18)    Giglio Information.  Pursuant to Giglio v. United States, 405 U.S. 150 (1972), the defendant

12 requests all statements and/or promises, express or implied, made to any government witnesses, in exchange

13 for their testimony in this case, and all other information which could arguably be used for the impeachment

14 of any government witness.

15         (19)    Agreements Between the Government and Witnesses.  In this case, the defendant requests

16 identification of any cooperating witnesses, who have committed crimes, but were not charged, so that they

17 may testify for the government in this case.  The defendant also requests discovery regarding any express or

18 implicit promise; understanding; offer of immunity; past, present, or future compensation; or any other kind

19 of agreement or understanding, including any implicit understanding relating to criminal or civil income tax,

20 forfeiture or fine liability between any prospective government witness and the government (federal, state

21 and/or local).  This request also includes any discussion with a potential witness about, or advice concerning,

22 any contemplated prosecution, or any possible plea bargain, even if no bargain was made, or the advice not

23 followed.  **Mr. Ponce-Salazar further requests disclosure of all arrangements between the material**

24 **witness and the government.**

25         Pursuant to United States v. Sudikoff, 36 F.Supp.2d 1196 (C.D. Cal. 1999), the defense requests all

26 statements made, either personally or through counsel, at any time, which relate to the witnesses' statements

27 regarding this case, any promises -- implied or express -- regarding punishment/prosecution or detention of

28 these witnesses, any agreement sought, bargained for, or requested on the part of the witness at any time.

(20)    <u>Informants and Cooperating Witnesses</u>. To the extent that there was any informant, or any other tip leading to a TECS hit in this case, the defendant requests disclosure of the names and addresses of all informants, or cooperating witnesses, used, or to be used, in this case, and in particular, disclosure of any informant who was a percipient witness in this case, or otherwise participated in the crime charged against Mr. Ponce-Salazar. The government must disclose the informant's identity and location, as well as the existence of any other percipient witness, unknown or unknowable, to the defense. <u>Roviaro v. United States</u>, 353 U.S. 53, 61-62 (1957). The government must disclose any information derived from informants, which exculpates, or tends to exculpate, the defendant.

(21)    <u>Bias by Informants or Cooperating Witnesses</u>. The defendant requests disclosure of any information indicating bias on the part of any informant or cooperating witness. <u>Giglio v. United States</u>. Such information would include what, if any, inducements, favors, payments, or threats were made to the witness to secure cooperation with the authorities.

(22)    <u>Residual Request</u>. Mr. Ponce-Salazar intends, by this discovery motion, to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Ponce-Salazar requests that the government provide his attorney with the above-requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

### III.

### <u>MOTION TO RELEASE GRAND JURY TRANSCRIPTS</u>

Mr. Ponce-Salazar moves this Court to compel the government to produce all grand jury transcripts in this case. <u>See</u> U.S. CONST. AMENDS V & VI[3]. Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) allows

---

[3] The Supreme Court has found that "[t]he grand jury is an integral part of our constitutional heritage which was brought to this country with the common law. The Framers, most of them trained in the English law and traditions, accepted the grand jury as a basic guarantee of individual liberty . . . the grand jury continues to function as a barrier to reckless or unfounded charges. 'Its adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice.' <u>Costello v. United States</u>, 350 U.S. 359, 362 (1956). Its historic office has been to provide a shield against arbitrary or oppressive action, by insuring that serious criminal accusations will be brought only upon the considered judgment of a representative body of citizens acting under oath and under judicial instruction and guidance." <u>United States v. Manduano</u>, 425 U.S. 564, 571 (1976). In order to ensure that the criminally accused are safeguarded from reckless and unfounded charges, judges must take their duty to provide

1    disclosure "at the request of a defendant who shows that a ground may exist to dismiss the indictment because

2    of a matter that occurred before the grand jury."  In this case, release of the grand jury transcripts is

3    appropriate because: one, it is likely that the government misinstructed the grand jury on "bring to" liability

4    in light of <u>United States v. Lopez</u>, 484 F.3d 1186 (9th Cir. 2007) (en banc); and two, it is likely that there will

5    be a fatal variance between the theory of liability presented to the grand jury and the evidence that will be

6    presented before the petit jury.

7              Regarding the first issue, in <u>Lopez</u>, the Ninth Circuit set forth the analytical model to be applied in

8    analyzing whether a defendant acting entirely within the United States may be thought to have aided and

9    abetted another actor in bringing aliens to the United States in violation of 8 U.S.C. § 1324(a)(2), and 18

10   U.S.C. § 2.

11              The mere act of picking up aliens at a location near the border and transporting them within
               the United States is not sufficient to support a conviction for aiding and abetting a 'brings
12             to' offense.

13   <u>Id.</u> at 1199-1200 (footnote omitted).    The <u>Lopez</u> Court thoroughly examined the statutes at issue and

14   determined that:

15              [o]n a plain reading of the statutory language, then, a person who moves aliens from one
               location in the United States to another has not brought the aliens "to" the United States,
16             has not acted extraterritorially, and has not committed a "brings to" offense.  He has acted
               entirely on domestic soil and has committed only a "transports within" offense.
17

18   484 F.3d at 1195.  Honoring the statutory scheme set forth in section 1324, in which several offenses with

19   varying penalties are set forth, <u>Lopez</u> held that "the 'brings to' offense does not continue beyond the point at

20   which the 'transports [wholly] within' offense begins."  <u>See id.</u> at 1196 (brackets in original, footnote omitted).

21   <u>Lopez</u> thus "permit[s] prosecution of the secondary wrongdoers -- those who act entirely in the United States

22   -- only under the 'transports within' provision ...."  <u>See id.</u> at 1197.  Thus, an individual who is alleged to have

23   acted entirely within this country, cannot be liable as a principal in a "brings to" offense unless that individual

24   is guilty as an aider and abettor.  <u>See id.</u> at 1191.

25   _____

26   guidance seriously and not simply pay lip service to the assurances of the government.  It is curious
     why the government, in this district in particular, fights so hard to keep grand jury proceedings
27   sealed.  Interestingly, in many cases, the "witness" who "testifies" before the grand jury is a border
     patrol agent who neither participated in the arrest or the investigation.  He is only called to read a
28   report which has been prepared by others.  Such a practice does not allow for the considered
     judgment of grand jurors.  Thus, the release of transcripts is appropriate.

1  The government in <u>Lopez</u> offered two theories of aiding and abetting liability.  First, it argued that

2  the brings to offense continued until the aliens' reached their "immediate destination."  <u>See id.</u> at 1191.  This

3  theory, however, was flatly rejected by <u>Lopez</u> as having "little basis in the law."  <u>See id.</u> at 1197.

4  Second, the government argued that "aiding and abetting liability was established by its showing that

5  prior to the termination of the offense the defendant acted in a fashion that enabled or encouraged others to

6  commit [the 'brings to'] offense."  <u>See id.</u> at 1191.  <u>Lopez</u> found that this theory was legally tenable, but not

7  on the <u>Lopez</u> facts.  *See id.* at 1199-1201 & n.18.  Specifically, <u>Lopez</u> found that "the termination point of

8  the 'brings to' offense as the end of the initial wrongdoer's physical involvement...."  <u>See id.</u> at 1197.

9  The facts in <u>Lopez</u> are quite similar to those presented here.  The government alleges that Mr. Ponce-

10  Salazar, like Ms. Lopez, picked up a group of aliens who had already been brought to the United States and

11  who were awaiting transportation.  <u>See id.</u> at 1189.  <u>Lopez</u> holds that "[t]he mere act of picking up aliens at

12  a location near the border and transporting them within the United States is     Thus, in order to ensure that the

13  government did not misinstruct the grand jury, release of the grand jury transcripts is appropriate.

14  **IV.**

15  **MOTION TO COMPEL THE GOVERNMENT
TO PROVIDE A BILL OF PARTICULARS**

16

17  If this Court denies the above motion to compel the production of grand jury transcripts, then

18  Mr. Ponce-Salazar moves this Court to direct the government to file a bill of particulars.  <u>See</u> Fed. Rule Crim.

19  Pro. 7(f).  A bill of particulars is warranted where it will enable adequate preparation of the defense and

20  prevent surprise at trial.  <u>United States v. Giese</u>, 597 F.2d 1170, 1180 (9th Cir. 1979).  A bill of particulars

21  provides a defendant with the details of the charges necessary to present a defense, to avoid prejudicial

22  surprise at trial, and to protect against a second prosecution based on the same facts.  <u>See</u> <u>United States v.</u>

23  <u>Cecil</u>, 608 F.2d 1294, 1296 (9th Cir. 1979) (noting also that a bill of particulars ensures that the defendant

24  is tried on the basis of facts presented to a grand jury).  Mr. Ponce-Salazar has rights under the Fifth and Sixth

25  Amendments and Fed. R. Crim. P. 7(f) to notice of the charges against him and to a fair trial with an

26  opportunity to defend himself against the charges.  In addition, a bill of particulars guarantees a defendant's

27  Fifth Amendment right to be tried on a charge found by a Grand Jury, as a defendant is entitled to know the

28  Government's theory as to a particular count.  <u>See</u> <u>Yeargain v. United States</u>, 314 F.2d 881, 882 (9th Cir.

1963). This is true even where the indictment states all the ingredients of the offense. <u>Myers v. United States</u>, 15 F.2d 977, 983 (8th Cir. 1926) ("The office of a bill of particulars attaches without distinction, where the indictment states all the ingredients of the offense and further detail may be required or demanded for the protection of the defendant"). <u>See also United States v. Thompson</u>, 189 F. 838, 839 (W.D.Va. 1911) ("An indictment may be so expressed as to be good on demurrer and which still does not give the defendant all the information which he should in fairness have in order to properly prepare for trial, and in such case the defects in the indictment, in Federal practice, may be overcome by a bill of particulars").

In this case, Mr. Ponce-Salazar has no idea how the government will attempt to prove the elements of Counts One, Three, and Five, that he "did bring to the United States [the material witnesses] for purposes of commercial advantage and private financial gain...." Nothing in the indictment provides sufficient notice of how Mr. Ponce-Salazar is linked to these counts, and the government has not produced any discovery linking Mr. Ponce-Salazar to the material witnesses' entry. In the absence of a bill of particulars, Mr. Ponce-Salazar is not in a position to adequately prepare to defend this seemingly baseless allegation at trial. Accordingly, Mr. Ponce-Salazar moves this Court to order the government to produce a bill of particulars explaining its theory of liability on these counts.

**V.**

**<u>MOTION TO SUPPRESS STATEMENTS</u>**

Mr. Ponce-Salazar moves to suppress any statements made at the time of his arrest on the grounds that his <u>Miranda</u> waiver was not knowing, intelligent, and voluntary. Moreover, Mr. Ponce-Salazar moves to suppress any other statements made on the grounds that those statements were not made voluntarily.

**A.    The Government Must Demonstrate Compliance with <u>Miranda</u>.**

In order for any statements made by Mr. Ponce-Salazar to be admissible against him, the government must demonstrate that they were obtained in compliance with <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Specifically, the government must establish that Mr. Ponce-Salazar waived his rights and that any waiver of his <u>Miranda</u> rights was voluntary, knowing, and intelligent. <u>See Schneckloth v. Bustamonte</u>, 412 U.S. 218 (1973). When an interrogation continues without the presence of an attorney, and a statement results, the government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his privilege against self-incrimination. <u>Miranda</u>, 384 U.S. at 475. The court must indulge every reasonable

11

1   presumption against waiver of fundamental constitutional rights, so the burden on the government is great.

2   United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

3   　　In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality

4   of the circumstances surrounding the case.  Edwards v. Arizona, 451 U.S. 477 (1981); United States v.

5   Garibay, 143 F.3d 534 (9th Cir. 1998).  The Ninth Circuit has held that determination of the validity of a

6   Miranda waiver requires a two prong analysis:  the waiver must be both (1) voluntary and (2) knowing and

7   intelligent.  Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990).  The second prong requires an inquiry into

8   whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and

9   the consequences of the decision to abandon it."  Id. at 820-821 (quoting Colorado v. Spring, 479 U.S. 564,

10  573 (1987)).  Not only must the waiver be uncoerced, then, it must also involve a "requisite level of

11  comprehension" before a court may conclude that Miranda rights have been legitimately waived. Id. (quoting

12  Colorado v. Spring, 479 U.S. at 573).  Unless and until Miranda warnings and a knowing and intelligent

13  waiver are demonstrated by the prosecution, no evidence obtained as a result of the interrogation can be used

14  against the defendant.  Miranda, 384 U.S. at 479.  The government in this case must prove that Mr. Ponce-

15  Salazar waived his rights intelligently and voluntarily.  Mr. Ponce-Salazar disputes any allegation that his

16  waiver was knowing, intelligent, and voluntarily.

17  **B.     Mr. Ponce-Salazar's Statements Must Be Voluntary.**

18  　　Even if this Court determines that Mr. Ponce-Salazar validly waived his Miranda rights, it must still

19  make a determination that any statements are voluntary.  Under 18 U.S.C. § 3501(a), this Court is required

20  to determine, whether any statements made by Mr. Ponce-Salazar are voluntary.  In addition, section 3501(b)

21  requires this Court to consider various enumerated factors, including whether Mr. Ponce-Salazar understood

22  the nature of the charges against him and whether he understood his rights.  Without such evidence, this Court

23  cannot adequately consider these statutorily mandated factors.

24  　　Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual

25  determination is required, Fed. R. Crim. P. 12 obligates courts to make factual findings.  See United States

26  v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important

27  as the trial itself,'" id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be

28  supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's

1 responsive pleading.  Therefore, prior to admitting any alleged statements from Mr. Ponce-Salazar, a hearing

2 must be held to determine whether the statements were voluntary.

3                                                   **VI.**

4 **SUPPRESS ALL EVIDENCE SEIZED IN VIOLATION OF THE FOURTH AMENDMENT.**

5          The Fourth Amendment  prohibits "unreasonable" searches and seizures.  U.S. CONST. amend. IV;

6 Terry v. Ohio, 392 U.S. 1, 20-21 (1968). The test of whether a seizure is reasonable entails a balancing of the

7 governmental interest that justifies the intrusion against the individual's privacy expectations and interests.

8 See Ferguson v. City of Charleston, 532 U.S. 67, 84 n.21 (2001); see also Mich. Dep't of State Police v. Sitz,

9 496 U.S. 444, 448-49 (1990).

10          The Fourth Amendment specifically prohibits unreasonable searches and seizures of a vehicle during

11 brief investigatory stops.  See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).  Moreover, an

12 officer may detain a motorist only upon a demonstration of "reasonable suspicion" of criminal activity.  See

13 United States v. Cortez, 449 U.S. 411, 417 (1981); see also United States v. Rodriguez, 976 F.2d 592, 594

14 (9th  Cir. 1992), amended 997 F.2d 1306 (9th Cir. 1993).  That "reasonable suspicion" must consist of

15 "specific, articulable facts which, together with objective and reasonable inferences, form the basis for

16 suspecting that the particular person detained is engaged in criminal activity." Rodriguez, 976 F.2d at 594

17 (citations omitted); see also United States v. Sigmond-Ballesteros, 285 F.3d 1117 (9th Cir. 2002).  A "gloss

18 on this rule prohibits reasonable suspicion from being based on broad profiles which cast suspicion on entire

19 categories of people without any individualized suspicion of the particular person to be stopped." Sigmond-

20 Ballesteros, 285 F.3d at 1121 (quoting United States v. Rodriguez-Sanchez, 23 F.3d 1488, 1492 (9th Cir.

21 1994), (overruled in part on other grounds); see also United States v. Montero-Camargo, 208 F.3d 1122,

22 1131-32 (9th Cir. 2000); United States v. Garcia-Camacho, 53 F.3d 244, 245-46 (9th Cir. 1995); United States

23 v. Mariscal, 285 F.3d 1127 (9th Cir. 2002).

24          A determination of whether an officer had "reasonable suspicion" of wrongdoing is "'not readily,

25 or even usefully, reduced to a neat set of legal rules.'" Ornelas v. United States, 517 U.S. 690, 695-96 (1996)

26 (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)); see also United States v. Hernandez- Alvarado, 891

27 F.2d 1414, 1416 (9th Cir. 1989).  Rather, in making reasonable-suspicion determinations, the court must

28 consider the "totality of the circumstances" of each case to see whether the detaining officer has a

1  "particularized and objective basis" for suspecting criminal activity.  <u>United States v. Cortez</u>, 449 U.S. 411,

2  418 (1981); <u>see also</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 266 (2002) (holding that the "totality of the

3  circumstances" inquiry of an investigatory stop of a vehicle must be based on all factors, collectively, and not

4  each in isolation).  While this inquiry "includes the 'collective knowledge of the officers involved, and the

5  inferences reached by experienced, trained officers,'"  <u>Hall,</u> 974 F.2d at 1204 (other internal quotations

6  omitted), this experience  may <u>not</u> be used to give the officers unbridled discretion in making a stop.  <u>See</u>

7  <u>Hernandez-Alvarado</u>, 891 F.2d at 1416; <u>see also</u> <u>Florida v. J.L.,</u> 529 U.S. 266, 271 (2000) (finding that a tip

8  from an anonymous informant did not give rise to sufficient reasonable suspicion to perform a <u>Terry</u> stop).

9

10  In this case, the information and activities on which the arresting agents relied to make the

11  investigatory stop did not give rise to reasonable suspicion.  According to information provided by the

12  government, the only basis for initiating the traffic stop were: (1) the location;[4] (2) the fact that the car was

13  speeding; (3) that the windows were tinted; (4) that the car appeared to be heavily loaded; (5) that the

14  windows were foggy; and that the driver appeared nervous. This evidence is weak, inconsistent, and does not

15  rise to the requisite level of individualized suspicion required under the Fourth Amendment to seize and

16  detain a person.  Thus, the agents lacked reasonable suspicion to stop the car.  Therefore, because the agents

17  lacked reasonable suspicion, all evidence flowing from the illegal stop must be suppressed.  <u>See</u> <u>Wong Sun</u>

18  <u>v. United States</u>, 371 U.S. 471 (1963).[5]

19

20

21

22

23

24

25

26      [4]    This factor is easily dismissed because it appears that this agent believes that all of

27  North County and Logan Avenue are hotbeds of smuggling activity.

28      [5]    The requests to suppress evidence includes, but is not limited to, the material

witnesses, and any statements or other evidence seized as a result of this unlawful stop.

**VII.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. OLEA OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  See CR at 11.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[6]  These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[7]

> **1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[8] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See id.

---

[6]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[7]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Olea requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[8]  See also id. at 20 ("You're all about probable cause.").

1  at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that

2  judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

3  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

4  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

5  because the grand jurors disagree with a proposed prosecution.

6         Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred

7  to an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

8            I've gone over this with a couple of people.  You understood from the questions and
             answers that a couple of people were excused, I think three in this case, because they could
9            not adhere to the principle that I'm about to tell you.

10 Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

11 disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

12 view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

13        Examination of the recently disclosed voir dire transcript, which contains additional instructions and

14 commentary in the form of the give and take between Judge Burns and various prospective grand jurors,

15 reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists

16 and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress

17 merely compounded an erroneous series of instructions already given to the grand jury venire.  In one of his

18 earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause

19 determination.

20           [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
             crime was committed?  And second, do we have a reasonable belief that the person that
21           they propose that we indict committed the crime?"

22           If the answer is "yes" to both of those, then the case should move forward.  If the answer
             to either of the questions is "no," then the grand jury should not hesitate and not indict.
23

24 See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

25 term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

26 addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

27 committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

28 crime."

1    Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that,

2  in some unknown set of circumstances, they might decline to indict even where there was probable cause.

3  Because of the redactions of the grand jurors' names, Mr. Olea will refer to them by occupation.  One is a

4  retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).  The

5  CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not

6  an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified immigration

7  cases.  See id.

8    Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

9  CSW.  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

10  district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

11  Rather, he provided instructions suggesting that, in any event, any scruples CSW may have possessed were

12  simply not capable of expression in the context of grand jury service.

13    Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as
     the defendant is ultimately entitled to a fair trial and the person that's accused is entitled

14    to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United
     States entitled to a fair judgment.  If there's probable cause, then the case should go

15    forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't
     like what our government is doing.  I disagree with these laws, so I'm not going to vote for

16    it to go forward."  If that is your frame of mind, the probably you shouldn't serve.  Only
     you can tell me that.

17

18  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

19  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

20  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See Id.

21  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

22  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

23  charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question provided

24  no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

25  amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

26  listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit

27  them to vote "no bill" in the face of a showing probable cause.

28

17                                              08CR1019-BTM

1   Just in case there may have been a grand juror that did not understand his or her inability to exercise

2   anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA

3   first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

4   "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical

5   marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty

6   considerations into account.

7       Well, those things -- the consequences of your determination shouldn't concern you in the
        sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they
8       cannot consider the punishment or the consequence that Congress has set for these things.
        We'd ask you to also abide by that. We want you to make a business-like decision of
9       whether there was a probable cause. . . .

10  Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

11  on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

12      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

13  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

14  juror is obligated to vote to indict if there is probable cause.

15      I can tell you sometimes I don't agree with some of the legal decisions that are indicated
        that I have to make. But my alternative is to vote for someone different, vote for someone
16      that supports the policies I support and get the law changed. It's not for me to say, "well,
        I don't like it. So I'm not going to follow it here."
17
        You'd have a similar obligation as a grand juror even though you might have to grit your
18      teeth on some cases. Philosophically, if you were a member of congress, you'd vote
        against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote
19      against criminalizing some drugs.

20      That's not what your prerogative is here. You're prerogative instead is to act like a judge
        and say, "all right. This is what I've to deal with objectively. Does it seem to me that a
21      crime was committed? Yes. Does it seem to me that this person's involved? It does." *And
        then your obligation, if you find those to be true, would be to vote in favor of the case going
22      forward.*

23  Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

24  questions are answered in the affirmative, lead to an "obligation" to indict.

25      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

26  paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation

27  to indict in every case in which there was probable cause.

28

1      The Court: Do you think you'd be inclined to let people go in drug cases even though you

2      were convinced there was probable cause they committed a drug offense?

3      REA: It would depend on the case.

4      The Court: Is there a chance that you would do that?

5      REA: Yes.

6      The Court: I appreciate your answers.  I'll excuse you at this time.

7 Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

8 political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

9 should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

10 indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge

11 Burns made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA

12 to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to

13 indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

14 forward."[9]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

15 was too great a risk to run.

16     **2.**     **The Instructions Posit a Non-Existent Prosecutorial Duty to Offer**
            **Exculpatory Evidence.**

17

18      In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

19 grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

20 Ex. A at 20.[10]

21 _____

22    [9] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has

23 been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not

24 have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction

25 made the grand jury more inclined to indict irrespective of the evidence presented.

26    [10] These instructions were provided in the midst of several comments that praised the United

27 States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be

28 honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who

1   Now, again, this emphasizes the difference between the function of the grand jury and the
2   trial jury. You're all about probable cause. If you think that there's evidence out there that
    might cause you to say "well, I don't think probable cause exists," then it's incumbent upon
    you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
3   *duty-bound to present evidence that cuts against what they may be asking you to do if*
    *they're aware of that evidence.*

4

5   Id. (emphasis added).

6        The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7   "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

8   gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9   adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

10  Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence

11  that was "adverse" or "that cuts against the charge." See id.

12

13

14

15

16  _____

17  revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38,
    Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even
18  while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense
    to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good
19  faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying
    to indict innocent people or people that they believe to be innocent or the evidence doesn't
20  substantiate the charges against.").
         Judge Burns's discussion of his once having been a prosecutor before the Grand Jury
21  compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10.
    Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id.
22  at 8, he would not allow the government attorneys to act inappropriately or to present cases for
23  indictment where no probable cause existed.
         In addition, while Judge Burns instructed the Grand Jury that it had the power to question
24  witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the
    U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be
25  asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's
    independence is diluted by [such an] instruction, which encourages deference to prosecutors."
26  Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice,"
27  see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions
    provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will
28  follow instructions because, in fact, we are prohibited from examining jurors to verify whether they
    understood the instruction as given and then followed it.").

**B.** **_Navarro-Vargas_ Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[11] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted

---

[11] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., <u>Criminal Procedure</u>

2  § 15.2(g) (2d ed. 1999)).

3          Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

4  in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986).  <u>See id.</u>

5          The grand jury thus determines not only whether probable cause exists, but also whether
           to "charge a greater offense or a lesser offense; numerous counts or a single count; and
6          perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis
           of the same facts.  And, significantly, the grand jury may refuse to return an indictment
7          even "'where a conviction can be obtained.'"

8  <u>Id.</u> (quoting <u>Vasquez</u>, 474 U.S. at 263).  The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

9  the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury "controls

10  not only the initial decision to indict, but also significant questions such as how many counts to charge and

11  whether to charge a greater or lesser offense, including the important decision whether to charge a capital

12  crime."  <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263).  Judge Hawkins notes that the <u>Navarro-Vargas II</u>

13  majority accepts the major premise of <u>Vasquez</u>: "the majority agrees that a grand jury has the power to refuse

14  to indict someone even when the prosecutor has established probable cause that this individual has committed

15  a crime."  <u>See id.</u> at 1214 (Hawkins, J. dissenting).  <u>Accord</u> <u>Navarro-Vargas I</u>, 367 F.3d at 899 (Kozinski, J.,

16  dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

17  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

18  But not in Judge Burns's instructions.

19  **C.      Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
            in Both *Vasquez* and *Navarro-Vargas II*.**

20

21          The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

22  jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

23  decision in <u>Marcucci</u>.  <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon

24  every finding of probable cause because the term "should" may mean "what is probable or expected."  299

25  F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

26  Hawkins ably pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

27  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty' or

28  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  <u>See also</u>

1  id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and

2  Language Guide 1579 (1999) (brackets in original)).

3        The debate about what the word "should" means is irrelevant here; the instructions here make no

4  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

5  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

6  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

7  indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction flatly

8  bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand

9  juror would read this language as instructing, or even allowing, him or her to assess "the need to indict."

10 Vasquez, 474 U.S. at 264.

11       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

12 an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only

13 mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

14 only told the jurors that they "should" indict if there is probable cause, he told them that if there is not

15 probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context, it would

16 strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand

17 jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was

18 not.

19       The full passage cited above effectively eliminates any possibility that Judge Burns intended the

20 Navarro-Vargas spin on the word "should."

21       [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
         crime was committed?  And second, do we have a reasonable belief that the person that
22       they propose that we indict committed the crime?"

23       If the answer is "yes" to both of those, then the case should move forward.  If the answer
         to either of the questions is "no," then the grand jury should not hesitate and not indict.

24 See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that

25 if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

26 room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at

27 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting

28 the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

1  "responsibilities continue to include both the determination whether there is probable cause and the protection

2  of citizens against unfounded criminal prosecutions.") (citation omitted).

3        By the same token, if Judge Burns said that "the case should move forward" if there is probable

4  cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

5  Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended

6  two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

7  been his intent.  But even if it were, no grand jury could ever have had that understanding.[12]  Jurors are not

8  presumed to be capable of sorting through internally contradictory instructions.  See generally United States

9  v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

10  presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

11        Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

12  clear to the grand jurors that "should" was not merely suggestive, but obligatory:

13        **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

14  and excused a potential juror (CSW):

15        The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want

16        you to say, "Well, yeah, there's probable cause.  But I still don't like what the government

17        is doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that's

18        your frame of mind, then probably you shouldn't serve.  Only you can tell me that.

19        Prospective Juror: Well, I think I may fall in that category.

20        The Court: In the latter category?

21        Prospective Juror: Yes.

22        The Court: Where it would be difficult for you to support a charge even if you thought the

23        evidence warranted it?

24        Prospective Juror: Yes.

25        The Court: I'm going to excuse you then.

---

27      [12] This argument does not turn on Mr. Olea's view that the Navarro-Vargas/Marcucci reading

28  of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

08CR1019-BTM

1 <u>See</u> Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

2 juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

3 "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  <u>See id.</u> ("I

4 wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

5 was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

6 the exercise of discretion by any other prospective grand juror.

7       **(2)**      In an even more explicit example of what "should" meant, Judge Burns makes clear that it

8 there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

9 Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

10         You'd have a similar *obligation* as a grand juror even though you might have to grit your

11         teeth on some cases.  Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against criminalizing some drugs.

12
13         That's not what your *prerogative* is here.  Your prerogative instead is act like a judge and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to me that

14         a crime was committed?  Yes.  Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

15

16 <u>Id.</u> at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

17 were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

18 convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27.  The potential juror responded:

19 "It would depend on the case." <u>Id.</u>  Nevertheless, that juror was excused.  <u>Id.</u> at 28.  Again, in this context,

20 and contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the juror has no

21 prerogative to do anything other than indict if there is probable cause.

22       Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

23 a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

24 rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not

25 indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

26 prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

27 scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the

28 prospective jurors, because his message is that there is no discretion not to indict.

1     **(3)**     As if the preceding examples were not enough, Judge Burns continued to pound the point

2 home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist

3 on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws

4 here." See id. at 61.

5     **(4)**     And then again, after swearing in all the grand jurors who had already agreed to indict in

6 every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he

7 reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

8 that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what

9 the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

10      Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

11 penalties to which indicted persons may be subject.

12     Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case
    is about because there is a disparity between state and federal law.

13

14     The Court:  In what regard?

15     Prospective Juror: Specifically, medical marijuana.

16     The Court:  Well, those things -- the consequences of your determination shouldn't concern
    you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of*

17     *course, that they cannot consider the punishment or the consequence that Congress has set*
    *for these things. We'd ask you to also abide by that.* We want you to make a business-like
    decision of whether there was a probable cause. ...

18

19 See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause"

20 would obviously leave no role for the consideration of penalty information.

21      The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

22 penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

23 United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

24 reasons. First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

25 as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

26 ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly

27 authorized consideration of penalty information.  See 474 U.S. at 263.

28

        08CR1019-BTM

1    Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

2    again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

3    was probable cause.  These instructions go far beyond the holding of <u>Navarro-Vargas</u> and stand in direct

4    contradiction of the Supreme Court's decision in <u>Vasquez</u>.  Indeed, it defies credulity to suggest that a grand

5    juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

6    <u>Vasquez</u>:

7       The grand jury does not determine only that probable cause exists to believe that a
        defendant committed a crime, or that it does not.  In the hands of the grand jury lies the
8       power to charge a greater offense or a lesser offense; numerous counts or a single count;
        and perhaps most significant of all, a capital offense or a non-capital offense – all on the
9       basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case
        where a conviction can be obtained."

10

11   474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

12   dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

13   initial decision to indict, but also significant decisions such as how many counts to charge and whether to

14   charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

15   would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." <u>See</u>

16   <u>id.</u> at 264.  Judge Burns's grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore represent

17   structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

18   jury proceeding." <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

19   therefore be dismissed.  <u>Id.</u>

20       The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

21   instructions excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

22   independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

23   decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

24   have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

25   independent." <u>Id.</u> at 1202 (emphases in the original).

26       Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

27   'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

28   of many of its decisions -- sufficiently protects that power." <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The

1  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

2  making a probable cause determination ... unconstitutionally undermines the very structural protections that

3  the majority believes save[] the instruction." <u>Id.</u>  After all, it is an "'almost invariable assumption of the law

4  that jurors follow their instructions.'"  <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)).  If that

5  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

6  in <u>Vasquez</u>.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous

7  instructions because nothing will happen if they disobey them." <u>Id.</u>

8          In setting forth Judge Hawkins' views, Mr. Ponce understands that this Court may not adopt them

9  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

10  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

11          Here, again, the question is not an obscure interpretation of the word "should", especially in light

12  of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by

13  the Court in <u>Navarro-Vargas II</u> because they had not yet been disclosed to the defense, but an absolute ban

14  on the right to refuse to indict that directly conflicts with the recognition of that right in <u>Vasquez</u>, <u>Campbell</u>,

15  and both <u>Navarro-Vargas II</u> opinions.  <u>Navarro-Vargas II</u> is distinguishable on that basis, but not only that.

16          Judge Burns did not limit himself to denying the grand jurors the power that <u>Vasquez</u> plainly states

17  they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

18  prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." <u>See</u>

19  Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

20  embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

21  conscience of the community. <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand

22  jury exercising its powers under <u>Vasquez</u> "serves ... to protect the accused from the other branches of

23  government by acting as the 'conscience of the community.'") (quoting <u>Gaither v. United States</u>, 413 F.2d

24  1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

25  their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

26  here, Judge Burns has both fashioned his own rules and enforced them.

27

28

**D.     The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law. <u>See</u> 504 U.S. at 45, 51. <u>Williams</u> held that "as a general matter at least, no such 'supervisory' judicial authority exists." <u>See id.</u> at 47. Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance." <u>Id.</u> at 47 (emphasis added). The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure." <u>Id.</u> at 50. As a consequence, <u>Williams</u> rejected the defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law. <u>See id.</u> at 51-55.

Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. <u>See</u> Ex. A at 20.

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

<u>Id.</u> (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See id.</u> at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again,

the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll be informed of that.  *They have a duty to do that*."  See Ex. B at 14-15 (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

    (1)    I have to consider evidence that undercuts probable cause.

    (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

    (3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

1   of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

2   the Fifth Amendment.

## VIII.

### REQUEST FOR LEAVE TO FILE FURTHER MOTIONS

As new information surfaces due to the government providing discovery in response to these motions, or an order of this Court, defense may find it necessary to file further motions, or to supplement existing motions with additional facts.  The denial of this motion will result in a violation, at a minimum, of Mr. Ponce-Salazar's Fifth and Sixth Amendment rights.  Therefore, defense counsel requests the opportunity to file further motions based upon information gained from discovery.

## IX.

### CONCLUSION

For the reasons stated above, Mr. Ponce-Salazar moves this Court to grant his motions.

Respectfully submitted,

DATED: April 29, 2008                              /s/ John C. Ellis, Jr.
                                                   **JOHN C. ELLIS, JR.**
                                                   Federal Defenders of San Diego, Inc.
                                                   Attorneys for Mr. Ponce-Salazar